## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHIPP BROWN,

        Plaintiff,

    v.

PETCO ANIMAL SUPPLIES STORE,
INC., Store #1827, a/k/a PETCO
ANIMAL SUPPLIES, INC.,

        Defendant.

No. 4:21-CV-00330

(Chief Judge Brann)

## MEMORANDUM OPINION

### MARCH 6, 2023

It is undoubtedly unpleasant and personally challenging to be terminated from a job. It is likely even more unpleasant for an employee who has been with a company since 2002, who seemed to demonstrate close relationships with his colleagues, and purports to have consistently received favorable performance marks in certain categories for many years. Such is the situation of Plaintiff Shipp Brown, an African American man who worked for Defendant Petco Animal Supplies Store, Inc. ("Petco") for nearly twenty years until he was terminated (at age 65) by new management in 2018. Brown's termination came about after he received a rather expedited series of reprimands. Petco kept records of these reprimands and its observations of Brown's infractions, and the Court finds all but one of these records to be credible.

In response to his firing, Brown filed this suit against Petco, asserting various claims, all of which require a form of racial and/or age-based animus on Petco's part. The parties concluded discovery, and Petco has moved for summary judgment on all of Brown's claims. After reviewing the record, it appears to the Court that Brown's final managers did not like him, and that they may have even harbored animus toward him. Brown alleges, and his former colleagues agreed in affidavits, that Brown's manager was harsh with him and treated him unprofessionally. Another manager seemingly disliked Brown so much that she conducted an unannounced walkthrough of the store and, instead of issuing a formal reprimand, felt compelled to type a stream-of-consciousness list of grievances into an undated Word document.

Be that as it may, the Court is not a workplace mediator, nor is the Court in a position to tell Petco how to run its stores. The reasons Brown's managers did not like him is only the Court's concern to the extent that there is evidence that such animus was bred by racial or age-based discrimination. This matter is before the Court because Brown has leveled serious allegations against Petco, and those allegations require more than evidence of personal dislike, unprofessionalism, or friction between employees' personalities. They require evidence proving that Brown was fired because he was an older, black employee.

After careful review of the parties' briefing, the record, and relevant case law, the Court finds the record bereft of that evidence, which is the most important evidence needed in order for each of Brown's claims to survive. Brown simply has

not proven that Petco's actions were motivated by Brown's race and/or age. And despite Brown's attempt to shoehorn this evidence into the record via a seemingly sham affidavit, such evidence does not exist in the record.

The Court appreciates that being terminated from a job is upsetting, but when it is not for discriminatory, harassing, or retaliatory reasons, as established by law and proven with evidence, that termination does not violate federal law—even when the terminated employee was the only black individual and the oldest employee at the store. Consequently, Petco's motion for summary judgment is granted on all counts.

## I.    BACKGROUND

The Court will begin by setting forth the undisputed facts and procedural history of this matter.

### A.    Undisputed Facts

#### i.    Brown's Employment Background at Petco

Brown was hired as a full-time sales associate with Petco in or about September 2002, at Petco store number 1827 in State College, Pennsylvania (the "State College Store").[1] Beginning in or about June 2016, Brown assumed a newly-created position of Guest Experience Leader ("GEL") in the State College Store.[2] Job duties for a GEL at the State College Store included "[l]eading store execution,

---

[1]    Doc. 27 ¶ 1; Doc. 32 ¶ 1.
[2]    Doc. 27 ¶ 2; Doc. 32 ¶ 2.

training, communication and maintenance of Pet Services (Grooming Salon and Dog Training) initiatives as well as guest centric programs, to include but not limited to Showtime, Demo Program, Welcome to the Family, Meet the Critters, Pals Rewards, Getting to Know Petco and Adoptions programs, policies, procedures, safety procedures, and promotions."[3] As the GEL for the State College Store, Brown reported directly to the Store Leader, who reported to a District Leader.[4] On July 30, 2017, Catherine Oharah became the Store Leader for the State College Store, and in November 2017, Yelena Kharchevka became the District Leader.[5]

### ii.      The November 2017 EPN

On November 30, 2017, Brown received an Employee Performance Notice ("EPN"), signed by Oharah, which included a checked box for "Other (describe) Failure to lead" under the "Other Violations/Infractions" section.[6] The explanation listed stated:

> After multiple conversations surrounding salon standards and performance, specifically relating to personal items of the salon partners being stored in the salon, human food in the salon, and overtime in the salon, Shipp has failed to correct any of these issues, or hold any of the salon partners accountable for their actions of non compliance for these matters. Shipp was also directed on 3 separate occasions to complete EPN's (sic) for store partners that have failed to remain in compliance with the attendance policy. These dates of direction for completion were 10/16, 10/23, and 10/26. Shipp failed to

---

[3]   Doc. 27 ¶ 4; Doc. 32 ¶ 4.
[4]   Doc. 27 ¶ 5; Doc. 32 ¶ 5.
[5]   *Id.*
[6]   Doc. 27, Ex. D; Doc. 32, Ex. H.

hold any of the partners accountable for their attendance on any of the occasions when this was requested of him.[7]

In the section asking the author of the EPN to "[e]xplain the behavior/performance that needs to be corrected," the EPN continued:

> Shipp must lead the store in all aspects of pet services. The grooming salon must be brought to brand standard, and remain in compliance with company policies and procedures. Shipp (sic) ensure that no personal items are in the salon, and no food is in the salon by 12/5/17. Shipp must ensure that there is zero unapproved overtime in the salon immediately. Shipp must take a strong lead with all store partners in accountability. Partners must remain in compliance with brand standards and policy and procedures to ensure the business is able to operate smoothly. Shipp may not incur any unapproved overtime. . . . Shipp must manage his time on a daily basis and communicate immediately when an issue may arise. . . . Shipp is expected to take the leadership role that will lead the grooming salon to top box standards of 90% or higher.[8]

Under Petco's Grooming Operations Policy, "[f]ood is not permitted in the [grooming] salon," "all food must be kept in the breakroom," and "[p]ersonal items including purses and cell phones must be kept in the locker located in the breakroom."[9]

### iii.      The December 2017 Walkthrough

On a quarterly basis, Kharchevka would perform two "walkthroughs" of the State College Store, during which she would ensure that the store's pet grooming salon (the "Grooming Salon") was in compliance with the Grooming Operations

---

[7]   *Id.*
[8]   *Id.*
[9]   Doc. 27, Ex. E; Doc. 32, Ex. J.

Policy.[10] On December 22, 2017, Kharchevka performed a walkthrough and the Grooming Salon received what was called a "critical violation" for not following Petco's "7-Point Pet Care Check."[11] The 7-Point Pet Care Check required staff to check a pet's "nose, ears, mouth, underside, paws/nails, and skin and coat.[12]

### iv.     The December 2017 EPN

On or about December 28, 2017, Brown received another EPN, also signed by Oharah, and again for "failure to lead," which identified the following incidents:

- The Grooming Salon leader failed to complete a 7-point check of a pet.
- The Grooming Salon team incurred 5.30 hours of unapproved overtime.
- The dog trainer did not follow Petco's scheduling policies.[13]

The EPN further stated:

- Shipp must lead the team to proper cleaning standards, presentation standards, check in and out procedures, and scheduling standards. Shipp should reference the list that has been provided for him from his walk through with the district leader. Shipp must ensure that all partners are properly checking in dogs and that all of the proper information is documented in the service authorization form for each and every pet.
- Shipp must leverage documented accountability to partners that have failed to comply with company direction, including infractions such as [overtime] and pet injuries.
- Shipp must lead the team in dog training by completing the proper calendar cadence, which will include new classes to be starting each week. Shipp must also update the dog training kiosk to include all of the required information including pictures and bios.[14]

---

[10]  Doc. 27, ¶ 18.
[11]  Doc. 27, Ex. G; Doc. 32, Ex. M.
[12]  Doc. 27, Ex. E at p. 8; Doc. 32, Ex. M at p. 8.
[13]  Doc. 27, Ex. H at p. 2; Doc. 32, Ex. N at p. 2.
[14]  Doc. 27, Ex. H at p. 3; Doc. 32, Ex. N at p. 3.

This EPN, like the November EPN, checked the box for "Other" under the "Other Violations/Infractions" section.[15]

### v.      Additional Walkthroughs

Kharchevka performed two additional walkthroughs, one in January 2018 and another in February.[16] She documented the findings of the January walkthrough in an Animal Care Audit form.[17] The audit form listed a number of questions asking whether certain areas were clean or if other aspects of the store satisfied company standards in other respects (*e.g.*, do animal habitats have functional temperature gauges, is food displayed properly, are wellness cards being completed and updated).[18] Kharchevka responded to each question in the negative.[19]

Kharchevka documented the findings of the February 2018 walkthrough in a series of written descriptions and photographs (the "Photo Journal").[20] The Photo Journal described and depicted a "list of ongoing concerns," including cleanliness violations, improper storage, safety hazards, and improper scheduling procedures.[21]

---

[15]   Doc. 27, Ex. E at p. 1; Doc. 32, Ex. M at p. 1.
[16]   Doc. 27 ¶¶ 31-35, Exs. I, J.
[17]   Doc. 27, Ex. I; Doc. 32, Ex. R.
[18]   Doc. 27, Ex. I at BROWN000377; Doc. 32, Ex. R at same.
[19]   Doc. 27, Ex. I at BROWN000376-BROWN000379; Doc. 32, Ex. U at same.
[20]   Doc. 27, Ex. J.
[21]   *Id.*

### vi.  Brown's Termination

Brown was terminated from Petco on February 20, 2018.[22] At the time of his termination, he was the only African American Petco employee in the State College Store and its surrounding district.[23] During that same time period, at 65 years old, Brown was the oldest GEL in the State College Store and its surrounding district.[24] After Brown's termination, John McHugh—a 31-year old Caucasian man—was hired to be the GEL for the State College Store.[25]

### B.  Procedural History

Brown filed his Complaint on February 23, 2021.[26] Petco filed its Answer to the Complaint on May 14, 2021.[27] The parties attended mediation in October of 2021 but reached an impasse and were unable to resolve the matter.[28] Discovery for the matter closed on February 1, 2022[29] and Petco moved for summary judgment on all counts August 1, 2022.[30] That motion has been fully briefed and is ripe for disposition.[31]

---

[22]  Doc. 27 ¶ 36; Doc. 32 ¶ 36.
[23]  Doc. 27 ¶¶ 39-40; Doc. 32 ¶¶ 39-40.
[24]  Doc. 27 ¶ 41, Ex. C; Doc. 32 ¶ 41.
[25]  Doc. 32 ¶ 36, Ex. AA (Petco's Responses and Objections to Brown's First Set of Interrogatories, No. 7).
[26]  Doc. 1.
[27]  Doc. 7.
[28]  Doc. 17.
[29]  Doc. 13.
[30]  Doc. 26.
[31]  Docs. 26-28, 32-38, 41.

## II.   LAW

The legal standard for summary judgment is well established. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[32] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[33] "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[34] "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[35] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[36]

"The inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[37] Thus, "if the defendant in a run-of-the-

---

[32]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).
[33]  Fed. R. Civ. P. 56(a).
[34]  *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at 322).
[35]  *Clark*, 9 F.3d at 326.
[36]  *Id*.
[37]  *Liberty Lobby, Inc*., 477 U.S. at 252.

9

mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[38] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[39] "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[40]

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[41] "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[42]

---

[38] *Id.*
[39] *Id.*
[40] *Id. (quoting Improvement Co. v. Munson*, 81 U.S. 442, 447 (1871)).
[41] *Celotex*, 477 U.S. at 323 (internal quotations omitted).
[42] *Id.*

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[43] For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[44]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[45]  Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[46] On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[47]

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether

---

[43] *Liberty Lobby, Inc.*, 477 U.S. at 250.
[44] Fed. R. Civ. P. 56(c)(1).
[45] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003).
[46] Fed. R. Civ. P. 56(e)(2).
[47] *Id*. at (c)(3).

there is a genuine issue for trial."[48] "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[49] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[50]

## III.   ANALYSIS

First, the Court must determine whether this matter presents a genuine dispute of material fact. If it does, then summary judgment may be proper. If it does not, then the matter is entitled to judgment as a matter of law, and the Court will analyze each of Brown's claims accordingly. The Court finds that the parties do not dispute the material facts underlying Brown's claims.

### A.   Count I (Discrimination Based on Race under Title VII and PHRA)[51]

Brown argues that he has established a *prima facie* case of race discrimination, and that Petco must establish that it had a legitimate, nondiscriminatory reason for its action.[52] Petco argues that it did have such a reason, which is that Brown was a poorly performing employee.[53] Brown then argues that Petco's "poor performance" rationale was a mere pretext for racial discrimination, and that a factfinder could

---

[48]   *Liberty Lobby, Inc.*, 477 U.S. at 249.

[49]   *Id*.

[50]   *Id*. at 249-50 (internal citations omitted).

[51]   *See Johnson v. Fed. Express Corp.*, 996 F. Supp. 2d 302, 313-14 (M.D. Pa. Feb. 10, 2014) ("[T]he Third Circuit has held that the PHRA is treated as identical to federal anti-discrimination laws[.]") (internal quotations and citations omitted).

[52]   Doc. 38 at pp. 7-8.

[53]   Doc. 28 at p. 5.

reasonably disbelieve that Brown had been terminated for poor performance and could instead conclude that a discriminatory motive was the reason for Petco's termination of Brown.[54]

Brown cites the EPNs he received and argues that they were created so Petco could "create[ ] a paper trail to facially support Brown's termination."[55] Brown also argues that the Photo Journal created by Kharchevka was illegitimate and inaccurate for the following reasons:

- Kharchevka claims that employee Christa Rzasa was present for the walkthrough where the photos were taken, but Rzasa was unable to recall the specific date of the walkthrough or recognize the photographs upon which Kharchevka relied.[56]
- The photographs included in the Photo Journal are not date or time-stamped.[57]
- Kharchevka claims that the photos were taken on February 9, 2018, but Brown claims they were taken on a different day and depict an issue (dog food and 'backers rack' placement) of which Brown had been previously made aware and ultimately remedied.[58]
- The Photo Journal included a photograph of a whiteboard calendar, which Kharchevka claimed had not been properly updated. Kharchevka claims to have taken the photograph on February 14, 2018.[59] Brown claims to have taken his own photograph of the whiteboard on February 14, 2018, and in that photograph the calendar was up to date.[60]

---

[54] Doc. 38 at p. 8.
[55] *Id*. at p. 9.
[56] Doc. 32 ¶ 32, Ex. C (Kharchevka Dep. Tr.) 157:14-22, Ex. T (Rzasa Dep. Tr.) 78:19-79:5, 80:16-81:2.
[57] *Id*. ¶ 32.
[58] *Id*., Ex. U at PETCO000698 and PETCO000704.
[59] *Id*., Ex. U at PETCO000711.
[60] *Id*., compare Ex. U at PETCO000711 to Ex. W at BROWN000137.

Petco argues that it had a legitimate, nondiscriminatory reason for terminating Brown, and that Brown cannot establish that his firing was due to any pretextual reason.[61] Petco further clarifies that the "only adverse action at issue is Brown's termination," and that the EPNs issued were not adverse actions for Title VII purposes because they had no materially adverse effect on Brown's compensation, terms, conditions, or privileges of employment.[62] Petco alleges that Brown "has no admissible evidence to establish pretext."[63] The Court agrees with Petco.

Title VII provides that it is "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[64] Title VII claims are governed by a burden-shifting framework, which requires an employee to show that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) that adverse employment action took place under circumstances that give rise to an inference of unlawful race-based discrimination.[65] The last element also requires that the employee demonstrate a

---

[61]  Doc. 28 at p. 5.
[62]  *Id*. at p. 12, n.5.
[63]  *Id*. at p. 4.
[64]  42 U.S.C. § 2000e-2(a)(1); *see Thompson v. Kellogg USA, Inc.*, No. 4:12-CV-02528, 2014 U.S. Dist. LEXIS 186286, at *17-18 (M.D. Pa. Aug. 4, 2014).
[65]  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *see Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 325-26 (3d Cir. 2015).

causal connection between his protected status and the allegedly adverse action.[66] The elements of a *prima facie* Title VII discrimination claim "must not be applied woodenly but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination."[67]

If a plaintiff provides evidence to support a *prima facie* case by a preponderance of the evidence, the defendant must then "articulate some legitimate, nondiscriminatory reason for the employee's [termination]."[68] The employer's burden can be satisfied "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."[69] If the defendant is able to articulate this, then the burden shifts back to the plaintiff who must prove "that the legitimate reasons proffered by the defendants were not its true reasons, but rather a pretext for discrimination."[70] A plaintiff can prove this pretext either directly or indirectly by "demonstrating that the defendant's proffered explanation is unworthy of credence."[71] Importantly, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."[72]

---

[66] *Sarullo*, 352 F.3d at 798.
[67] *Geraci v. Moody-Tottrup Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996).
[68] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).
[69] *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).
[70] *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993).
[71] *Id.*
[72] *Jones v. Sch. Dist. of Phila*, 198 F.3d 403, 412 (3d Cir. 1999).

Brown has satisfied his burden in making a *prima facie* case of employment discrimination based on race. First, as an African American, he is a member of a protected class.[73] Second, he was terminated, which constitutes an adverse employment action.[74] Finally, his firing gives rise to an inference of unlawful race discrimination because he was replaced by a Caucasian male.[75] Under the *McDonnell Douglas* burden-shifting framework, the inquiry is now whether Petco has demonstrated a legitimate, nondiscriminatory reason for firing Brown. Petco claims that Brown was terminated due to poor performance, the rationale for which was documented in the EPNs and Photo Journal.[76] Therefore, Petco argues it has satisfied its burden under *McDonnell Douglas*.

The inquiry for the Court, then, is whether Brown can demonstrate that the legitimate, nondiscriminatory reasons set forth by Petco are not true reasons, but instead pretext for racial discrimination. In his efforts to satisfy this burden, Brown

---

[73]  *Taylor v. Harrisburg Area Cmty. Coll.*, No. 1:12-CV-0169, 2014 U.S. Dist. LEXIS 11420, at *26-27 (M.D. Pa. Jan. 30, 2014) (citing *Tucker v. Thomas Jefferson Univ.*, 484 F. App'x 710, 712 (3d Cir. 2012)).

[74]  *Bossi v. Bank of Am.*, No. 3:14-CV-02301, 2016 U.S. Dist. LEXIS 110885, at *3 (M.D. Pa. Aug. 19, 2016) ("[T]ermination is an adverse employment action.")

[75]  *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007) (citation omitted) (finding that decision to replace an African American plaintiff with a Caucasian worker was sufficient to establish "the required inference of discrimination at the *prima facie* stage of Title VII analysis"); *see Lazard v. All Restore, LLC*, No. 19-6040, 2021 U.S. Dist. LEXIS 59200, at *18 (E.D. Pa. Mar. 29, 2021) ("In the Third Circuit, the fact that a plaintiff was replaced by an individual who is not a member of their protected class is sufficient to establish an inference of discrimination.").

[76]  Doc. 28 at p. 5.

attacks the credibility of Petco's alleged "paper trail," which includes the EPNs and the Photo Journal. The Court will evaluate their veracity separately.

### 1.   The EPNs[77]

Brown argues that the EPNs were pretextual because their reasoning "contradict[s] Brown's objective scores."[78] Specifically, Brown argues that within less than a month after he received the November 2017 EPN, the State College Store's Grooming Salon ranking went from 18 to 10, and the Salon's "Grooming Top Box Satisfaction Score" went from 85.19% to 91.67%.[79] The EPN also noted that employees had violated Petco's policy by improperly leaving personal items in the Salon, but Brown argues that was due to the fact that there had been a longstanding "exception" to this policy for the State College Store in light of the store's high volume.[80]

With respect to the November 2017 EPN, Petco argues that Brown himself "admitted" in his deposition testimony to the incidents which led to the discipline set forth in the EPN.[81] Petco also argues that any former policies regarding personal items in the salon that may have existed before Kharchevka assumed her role are

---

[77]  Brown's brief in opposition to Petco's motion also refutes the legitimacy of a third and final EPN allegedly created in February 2018. Doc. 38 at pp. 12-13; Doc. 32, Ex. GG. Petco does not set forth facts involving this EPN to support its motion, and the Court therefore finds that the parties dispute the legitimacy and facts surrounding this EPN. The resolution of that dispute, however, is not material under the summary judgment standard and has no bearing on this Court's analysis. The Court therefore elects not to analyze the February 2018 EPN.

[78]  Doc. 38 at p. 9.

[79]  *Id*. at p. 10.

[80]  *Id*.

[81]  Doc. 41 at p. 3.

irrelevant; Kharchevka was a new supervisor who was free to impose different and new requirements.[82]

Regarding the December 2017 EPN, Brown argues that he was not working on the day when Kharchevka conducted this walkthrough, and that he was "not present for this alleged failure."[83] Brown also takes issue with the fact that this EPN gave him a one-week period to improve the deficiencies noted.[84] "Despite this short timeframe," Brown argues, "[he] delivered, maintaining high Scores for the Salon[.]"[85]

As for the December 2017 EPN, Petco correctly notes that it is immaterial whether Brown was working on the date of Kharchevka's walkthrough.[86] As a GEL, Brown was responsible for leading and training employees to ensure their compliance with Petco's policies and procedures; further, Petco argues that Brown made a number of statements admitting that the infractions listed in the EPN took place, including "that employees in the Grooming Salon incurred unapproved overtime" and "that the dog trainer did not follow Petco policy[,] and that it was [Brown's] responsibility to ensure that she did so."[87] Most notably, Brown also acknowledged the following during his deposition:

---

[82] *Id.* at p. 3, n. 4.
[83] Doc. 38 at p. 11.
[84] *Id.* at p. 16.
[85] *Id.* at pp. 16-17.
[86] Doc. 41 at p. 4.
[87] *Id.*; *see*, *e.g.*, Doc. 27, Ex. A (Brown Dep. Tr.) at 79:15-20 (Brown responded "yes" when asked if individuals kept personal items in the Grooming Salon), 80:12-21 (Brown stated that

Q: And do you believe that you were issued this EPN because of your race or age?
A: No.[88]

The Court therefore agrees with Petco and finds that the November 2017 EPN and December 2017 EPN sufficiently demonstrate a legitimate, nondiscriminatory purpose for terminating Brown.

### 2.     The Photo Journal

Petco also cites the Photo Journal as evidence of Brown's poor performance.[89] Brown argues that there are "significant questions regarding the legitimacy and accuracy of the [P]hoto [J]ournal;"[90] the Court agrees with Brown. The Photo Journal is undated, does not appear to be an official business record (in contrast with the EPNs), and there is testimony from a Petco employee that reasonably calls into question whether the walkthrough allegedly depicted in the Photo Journal took place on the date Kharchevka claims.[91] Viewing this evidence and "draw[ing] reasonable inferences therefrom in the light most favorable to [Brown]," [92] the Court finds that

---

there was a closed container of food in the Grooming Salon), 82:9 (Q: [Y]our manager, Cathe Oharah, asked you to do something and you did not do it. Correct? A: That is correct.), 94:3-13 (Q: And it was your job to train the grooming salon on the proper procedures to follow though. Correct? A: Correct. . . . Q: During fiscal week 47 the salon team incurred 5.3 hours of unapproved overtime, even after multiple conversations with explicit direction that no overtime was approved. Do you agree that that occurred? A: It probably did[.]).

[88]  *Id*. at 98:13-15.

[89]  Doc. 41 at p. 5.

[90]  Doc. 38 at pp. 13-14.

[91]  *See* Doc. 32, Ex. C (Kharchevka Dep. Tr.) at 157:14-22, Ex. T (Rzasa Dep. Tr.) at 78:19-79:5; 80:16-81:2.

[92]  *Burnett v. Sch. Dist. of Cheltenham Twp.*, No. 04-2680, 2006 U.S. Dist. LEXIS 48956, at *3, n.2 (E.D. Pa. July 19, 2006) (citing *Liberty Lobby, Inc.,* 477 U.S. at 255).

the Photo Journal is not credible. In sum, the Photo Journal will not be considered as evidence to support any of Petco's claims.

### 3.    McHugh

Turning to the question of pretext, Brown argues that John McHugh, a 31-year old Caucasian male, is similarly situated to Brown and was treated more favorably—which should support a finding of pretext.[93] After Brown was terminated, McHugh immediately replaced him as the GEL for the State College Store.[94] McHugh "held the same position within the store, oversaw the same employees[,] and had the same [District Leader], Kharchevka."[95] He was also "subject to the same uniform standards and expectations" as Brown.[96] Brown argues that during McHugh's tenure as GEL for the State College Store, the Grooming Salon's rank dropped "quickly and dramatically" and received critical and failing audit scores.[97] Unlike Brown, McHugh was not terminated, nor did he receive any EPNs; instead, Brown alleges that he was promoted.[98]

Petco, on the other hand, argues that McHugh is not similarly situated and was not treated more favorably.[99] Initially, McHugh did not report to the same supervisor as Brown.[100] Further, McHugh did not "engage in the same performance-deficient

---

[93] Doc. 38 at pp. 14-15.
[94] *Id*. at p. 15.
[95] *Id*.
[96] *Id*.
[97] *Id*. at pp. 15-16.
[98] *Id*. at p. 16.
[99] Doc. 41 at pp. 6-9.
[100] *Id*. at p. 7.

conduct as Brown," such as keeping personal items in the Grooming Salon, failing to issue EPNs, and incurring unapproved overtime.[101] Petco contends that, absent evidence of similar pre-disciplinary conduct, Brown and McHugh are not similarly situated.[102] The Court agrees with Petco.

In order for a co-employee to be an appropriate comparator for "similarly situated" analysis purposes, "[he] should hold a similar position, report to the same supervisor, possess a similar disciplinary record, and engage in the same type of misconduct as the plaintiff."[103] And "to be considered similarly situated, comparator employees must be similarly situated in all respects," the determination of which will take into account "facts such as the employee's job responsibilities, the supervisors and decision-makers and the nature of the misconduct engaged in."[104]

Brown and McHugh were not similarly situated because McHugh is not alleged to have committed the same violations that were listed in the EPNs issued to Brown. While Brown may well be correct that the Grooming Salon's various scores and rankings decreased under McHugh's leadership, those metrics are distinguishable from the deficiencies listed on the November and December 2017 EPNs.[105] Had McHugh been disciplined for the same violations as Brown (*i.e.*,

---

[101] *Id*. at p. 8.

[102] *Id*. at p. 9.

[103] *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009).

[104] *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011).

[105] The Court is admittedly concerned by the fact that the State College Store's various scores were so low during McHugh's tenure as GEL, and Brown's allegations that McHugh was never disciplined—and was in fact promoted—despite these scores. Helpful evidence to drill down

leaving personal items in the grooming salon, incurring unapproved overtime, etc.), then the Court would be more inclined to find that the two were similarly situated as GELs. Because it is established that employees who do not engage in the same kind of misconduct are not similarly situated, Brown's allegations regarding McHugh fail.[106]

Because Brown points to no other evidence of pretext, the record does not include sufficient evidence demonstrating that Petco's legitimate, nondiscriminatory reason for terminating Brown was pretextual, Brown's claim for racial discrimination therefore fails and Petco's motion is granted as to Count I.

### B. Count II (Discrimination Based on Age under the ADEA and PHRA)[107]

Similar to his claim of race discrimination, Brown argues that has alleged a *prima facie* claim of age discrimination, and that Petco's "proffered reason for termination was pretext for age discrimination."[108] Brown cites the following as

---

[106] this concern would be, *e.g.*, what these scores mean, the weight given to these scores (if any) during evaluation of employee performance, and whether other employees have been disciplined or terminated due to declining scores. However, the Court cannot invent evidence where it does not exist or has not been collected during discovery.

[106] *Moussa v. Penn. Dep't of Pub. Welfare*, 413 F. App'x 484, 486-87 (3d Cir. 2011); *Montanez v. Missouri Basin Well Servs., Inc.*, No. 4:14-CV-00553, 2017 U.S. Dist. LEXIS 138086, at *26 (M.D. Pa. Aug. 28, 2017); *Yan Yan v. Fox Chase Cancer Ctr.*, No. 12-3858, 2014 U.S. Dist. LEXIS 131746, at *24-25 (E.D. Pa. Sept. 18, 2014).

[107] *See Willis v. UPMC Children's Hosp. of Pitt.*, 808 F.3d 638, 643 (3d Cir. 2015) ("Since this Court has determined that the interpretation of the PHRA is identical to that of federal anti-discrimination laws, including the ADEA, we present a single analysis for [the plaintiff's] claims under both statutes."); *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998) ("There is no need to differentiate between . . . the ADEA and PHRA claims because . . . the same analysis is used for both.").

[108] Doc. 38 at p. 18.

evidence of pretext: (1) discriminatory remarks made by Oharah (specifically that she called him "old school"); (2) inconsistencies in Petco's proffered reason for terminating Brown; and (3) evidence that McHugh, a younger employee, was treated more favorably than Brown.[109] Brown also cites to the fact that he was the oldest employee in the State College Store.[110]

Petco argues that Brown's status as the oldest employee in the State College Store is insufficient to establish pretext.[111] Next, Petco argues that Oharah's "old school" comment fails to establish pretext for three reasons. First, Petco argues that the comment is inadmissible hearsay.[112] Second, Petco argues that the comment itself was a "stray remark that cannot constitute sufficient evidence of age discrimination."[113] Oharah was also not the decisionmaker responsible for Brown's termination, nor was the remark made "in the context of the decision to terminate Brown."[114] Finally, Petco argues that placing the comment in the context in which it was made does not constitute pretext—Oharah's comment related to Brown's cash register accounting technique and was "unrelated to his age, his performance deficiencies, or his termination."[115]

---

[109] *Id*. at p. 19.
[110] *Id*. at p. 17.
[111] Doc. 41 at p. 9.
[112] *Id*. at p. 10.
[113] *Id*.
[114] *Id*. at pp. 10-11.
[115] *Id*. at p. 11.

The ADEA prohibits employers from discriminating against or firing employees on the basis of age.[116] A plaintiff asserting an ADEA age discrimination claim must allege: (1) that he was 40 years of age or older; (2) that the employer took an adverse employment action against him; (3) that he was qualified for the position in question; and (4) that he was ultimately replaced by another employee "who was sufficiently younger to support an inference of discriminatory animus."[117] To satisfy the fourth element, a plaintiff may either plead that "similarly situated employees who were under 40 were treated more favorably" than him, or he "may otherwise plead a causal nexus between [his] age and the adverse action taken."[118] The burden-shifting framework of *McDonnell Douglas* applies in the absence of direct evidence of age-based discriminatory animus.[119]

As with his racial discrimination claim, Brown has established a *prima facie* case of age discrimination,[120] so the question becomes whether Petco had a legitimate, nondiscriminatory reason for terminating Brown. For the same reasons stated in its analysis of Brown's racial discrimination claim, the Court finds that Petco had such a legitimate and nondiscriminatory reason—Brown's poor

---

[116] 29 U.S.C. § 623(a)(1); *Willis*, 808 F.3d at 643.

[117] *Studders v. Geisinger Clinic*, No. 4:20-CV-00914, 2021 U.S. Dist. LEXIS 25983, at *21 (M.D. Pa. Feb. 11, 2021) (citing *Smith v. Allentown*, 589 F.3d 684, 689 (3d Cir. 2009)).

[118] *Id.*

[119] *Smith*, 589 F.3d at 691 (3d Cir. 2009).

[120] *See Lukens v. Whitemarsh Valley Country Club*, No. 02-1279, 2003 U.S. Dist. LEXIS 20188, at *7 (E.D. Pa. Oct. 31, 2003) (stating that replacing an employee with a significantly younger person creates an inference of age discrimination) (citing *Showalter v. Univ. of Pitt. Med. Ctr.*, 190 F.3d 231, 234 (3d Cir. 1999) (internal quotations omitted)).

performance. And the Court agrees with Petco that Brown's status as the oldest employee is not sufficient to establish pretext.[121]

As for evidence of pretext, the only direct evidence of age-based discriminatory animus the Court can pinpoint is Oharah's "old school" comment, which—assuming it is admissible and an exception to hearsay as an admission of a party opponent under Rule 801(d)(2)(D)—the Court finds to be a "stray remark" that Brown has not demonstrated was related to the decisional process to terminate him.[122] The Court is also unpersuaded that the remark was even made in reference to Brown's age, as the term "old school" could also refer to someone being more traditional in practice or disposition.[123] Because the record does not include sufficient evidence demonstrating that Petco's legitimate, nondiscriminatory reason for terminating Brown was pretextual, Brown's claim for age-based discrimination fails and Petco's motion is also granted as to Count II.

---

[121] *See Helfrich v. Lehigh Valley Hosp.*, No. 03-CV-05793, 2005 U.S. Dist. LEXIS 4420, at *45 (E.D. Pa. Mar. 18, 2005) ("[T]he mere fact that [the plaintiff] was the oldest employee in his department does not create a discriminatory inference capable of surviving summary judgment.")

[122] *See Fuentes*, 32 F.3d at 767 (internal citations omitted) (stray remarks are "rarely given great weight"); *Kargbo v. Phila. Corp. for Aging*, 16 F. Supp. 3d 512, 524 (E.D. Pa. 2014) (a stray remark "standing on its own" is "insufficient to demonstrate age-related animus").

[123] *See* Doc. 28 at p. 11 (Petco's motion citing the definition of "old school" in Merriam-Webster Dictionary).

### C.      Counts III and IV (Harassment Based on Race and Age under Title VII and PHRA)[124]

Brown argues that he suffered harassment via a hostile work environment based on his race and age for several reasons. Specifically, he argues that "Oharah behaved in a manner so as to intentionally make Brown feel ostracized" by engaging in conduct such as refusing to speak to Brown directly, purposely choosing to communicate with other GELs instead of Brown, cutting off Brown's access to Petco's online portal, leaving excessive amounts of trash in the breakroom for Brown to clean up, and referring to Brown as "old school."[125]

Petco argues that Brown's allegations fail to satisfy three of the five elements required for a hostile work environment age or race harassment claim: that he suffered intentional discrimination because of his race or age; that the discrimination was pervasive and regular; and that the discrimination would detrimentally affect a reasonable person of the same race or age in that position.[126] Petco avers that Brown can point to no evidence indicating that Oharah's conduct was motivated by Brown's race or age, or that her conduct was sufficiently severe or pervasive as would detrimentally affect a reasonable person.[127] The Court agrees with Petco that there is insufficient evidence of animus based on race or age.

---

[124] *See Jacobsen v. Meron Med., LLC*, No. 20-6357, 2022 U.S. Dist. LEXIS 89155, at *29, n.13 (E.D. Pa. May 18, 2022) ("Because the analysis required for adjudicating Plaintiff's Title VII and PHRA claims is identical, the Court will consider those two claims together.").

[125] Doc. 38 at pp. 25-27.

[126] Doc. 28 at p. 12.

[127] *Id*. at pp. 12-16.

In order for a plaintiff to establish a claim of racial or age-based harassment, he must show the following: (1) that he suffered intentional harassment based on race (or age); (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected the plaintiff; (4) the harassment would have detrimentally affected a reasonable person in like circumstances; and (5) there is a basis for employer liability for the harassment under a theory of respondeat superior liability.[128] Title VII "protects only against harassment based on discrimination against a protected class; it is not a general civility code for the American workplace."[129]

Brown alleges that he experienced numerous examples of unfair treatment, and his opposition brief attached affidavits from other Petco employees who pledged that Brown was a model GEL whom Oharah treated more harshly than other employees.[130] While such treatment was likely unpleasant for Brown—and even if Oharah was unprofessional in behaving in this manner[131]—without more, this evidence is insufficient to establish that the treatment he experienced was due to Brown's race or age.

---

[128] *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

[129] *Reganick v. Sw. Veterans' Ctr.*, No. 06-1267, 2008 U.S. Dist. LEXIS 26726, at *16 (W.D. Pa. Mar. 19, 2008) (internal citations and quotations omitted).

[130] Doc. 32, Ex. X (Baldwin Aff.), Ex. Y (Smeal Aff.), Ex. Z (Jacobus Aff.).

[131] If Brown's allegations, and his former colleagues' affidavits about, Oharah's conduct are true, the Court notes that her conduct was unprofessional, even if not intentionally harassing or discriminatory. Petco can do with this what it will.

Indeed, incidents that describe a supervisor's "personality, temperament, and other various factors" tend to "cause favor or disfavor between co-workers" rather than implicate racial or age-based issues.[132] Such is the conduct Brown cites here. Giving an employee the silent treatment, leaving trash for him to pick up, and calling him "old school," prove at most that Oharah demonstrated a rude and unprofessional temperament to Brown. As regrettable as this conduct is, and as difficult as it may have been for Brown, he "cannot sustain a claim by asserting [these events] and then asserting [that they] were motivated by racial bias" or bias against his age.[133] And the law has made clear that a plaintiff's "subjective belief" that a protected characteristic played a role in an employment decision is not enough to sustain an inference of discrimination.[134] The inquiry is whether such discrimination motivated the employer, and there is no evidence to indicate that Oharah was motivated by bias against Brown's race or age.[135]

The Court therefore finds that Brown does not include evidence proving the first element of a harassment claim, *i.e.*, that he suffered intentional harassment based on his race or age. Accordingly, the Court declines to analyze the other elements. Petco's motion is granted as to counts III and IV.

---

[132] *Davis v. City of Newark*, 285 F. App'x 899, 903 (3d Cir. 2008).
[133] *Id.*
[134] *Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x 152, 153 (3d Cir. 2013).
[135] *See Jones*, 198 F.3d at 412.

### D.      Counts V and VI (Retaliation Based on Opposition to Race and Age Discrimination under Title VII and PHRA)[136]

Brown additionally argues that he has established a *prima facie* case of both racial and age-based retaliation as required by Title VII and PHRA, and that—following the *McDonnell Douglas* framework—Petco's decision to terminate him was pretextual and in retaliation for complaints that Brown describes in his affidavit.[137] Specifically, Brown states that Oharah intentionally treated him differently and poorly relative to other younger, non-African American employees; that he "informed Kharchevka of these ongoing issues;" that he "made these reports to Kharchevka in-person, by telephone, and through e-mail; and that "in these reports, [he] told Kharchevka [he] believed [he] was being treated this way due to race and age."[138] Brown also argues that he attempted to submit a complaint via Petco's "hotline" designated for such purposes, but was never called back.[139]

Petco disagrees that Brown has established a *prima facie* case because he did not participate in a "protected activity," and that his affidavit is a "sham" that exists solely to contradict his deposition testimony, where he stated that he did not tell Kharchevka that he believed he was being targeted due to this age or race.[140]

---

[136] *See Bentley v. Allbritton Commc'ns. Co.*, No. 1:07-CV-0889, 2008 U.S. Dist. LEXIS 93237, at *16, n.14 (M.D. Pa. Nov. 17, 2008) ("The analysis for both discrimination and retaliation claims under Title VII and PHRA is identical.") (citing *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (additional internal citations omitted)).
[137] Doc. 38 at pp. 21-24.
[138] Doc. 32, Ex. B (Brown Aff.) ¶ 35.
[139] Doc. 38 at pp. 21-24.
[140] Doc. 41 at pp. 13-14.

Regarding Brown's e-mail to Kharchevka, Petco again argues that Brown did not engage in a protected activity because he did not state in the e-mail that he felt he was being harassed or targeted due to his age and race.[141] And as for Brown's calls to the hotline, Petco asserts that the company has no records of having received any such calls—and that, even if it did have records of Brown's call(s), attempting to make a call does not constitute "protected action."[142] Petco further argues that, to the extent the Court does find that Brown has established a *prima facie* case, Petco had a legitimate and nondiscriminatory reason (poor performance) for terminating Brown, and that he has failed to provide evidence demonstrating pretext.[143] The Court agrees with Petco that Brown did not engage in a protected activity.

To establish a *prima facie* claim of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) the employer took adverse action against him; and (3) there exists a causal connection between his protected activity and the adverse employment action.[144] A plaintiff bringing a retaliation claim must be able to show that his participation in protected activity was the "but-for cause" of any alleged adverse employment action that he suffered.[145] The familiar *McDonnell*

---

[141] *Id.*
[142] *Id.* at p. 16.
[143] *Id.* at p. 17.
[144] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).
[145] *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

*Douglas* burden-shifting framework applies to race and age-based retaliation claims brought pursuant to Title VII and the PHRA.[146]

In order to constitute a "protected activity" for purposes of this claim, a complaint "must be specific enough to notify management of the particular type of discrimination at issue."[147] "All complaints or protests must be more than just general complaints of unfair treatment," and "[t]he Third Circuit has been clear that an employee has not engaged in protected opposition activity when he or she complains about unfair treatment, but stops short of referencing a protected characteristic as the basis of unfair treatment."[148]

Brown points to the following evidence as support for his claim that he engaged in protected activity: (1) his demographics; (2) verbal complaints he made to Kharchevka, and discussed during his deposition; (3) an e-mail he sent to Kharchevka; and (4) his attempted phone call to the Petco hotline.[149] The Court will analyze each in turn.

### 1.    Brown's Demographics

The parties do not dispute that Brown was both the oldest and the only black employee at the State College Store. There is no case law indicating that merely

---

[146]  *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016).

[147]  *Sanchez v. SunGuard Availability Servs. LP*, 362 F. App'x 283, 288 (3d Cir. 2010) (internal citations and quotations omitted).

[148]  *Kier v. F. Lackland & Sons, LLC*, 72 F. Supp. 3d 597, 616 (E.D. Pa. 2014) (citing *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 134-35 (3d Cir. 2000)).

[149]  Doc. 38 at pp. 21-24.

being a member of a protected class constitutes a protected activity. While these facts were relevant to Brown's other claims, his existence as an older African American man is not an activity in and of itself that warrants protection.

### 2.    Complaints to Kharchevka

Brown alleges that he had a number of telephone conversations with Kharchevka, and he discussed these conversations in both his deposition and in an affidavit he appended to his opposition brief.[150] The deposition and affidavit provide distinctly conflicting accounts, and—after reviewing both—the Court finds the affidavit to be a sham pursuant to the "sham affidavit" doctrine.

In his deposition, Brown stated the following:

> Q:    . . . How many times did you contact [Kharchevka]?
> A:    . . . I will say at least two or three times I did talk with her verbal[.] (sic)
> Q:    And when you had these telephone conversations with [Kharchevka], can you tell me everything you specifically remember telling her?
> A:    I did tell her that I felt like I was being singled out, that I as being targeted. And I'm like, I don't know what the reason for this is, but I'm like, I don't feel like I deserve this.[151]

Later in his deposition, when asked whether—during these verbal conversations with Kharchevka—he informed her that he felt targeted due to his *race or age*, Brown responded: "I told her I felt that I was being harassed. I didn't mention that. But obviously that's what it was."[152]

---

[150] *Id*. at p. 24.
[151] Doc. 27, Ex. A (Brown Dep. Tr.) 169:11-170:17.
[152] *Id*. at 171:24-172:5.

However, in the affidavit Brown submitted with his opposition brief, he pledged that "in these reports [to Kharchevka], I told Kharchevka I believed I was being treated this way due to my race and age."[153] The affidavit is in clear conflict with Brown's deposition testimony, which raises a red flag to the Court, pointing to the possibility that Brown's affidavit—or at least this portion of the affidavit—may be a sham.

The plain language of Rule 56 "permits consideration of affidavits in summary judgment proceedings,"[154] and it is established in the Third Circuit that some affidavits may be shams that cannot defeat summary judgment. "A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment."[155] And if an affidavit "is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord the affidavit evidentiary weight and that summary judgment is appropriate."[156] Further—and this is particularly notable here—"[t]he main practical reason supporting the sham affidavit doctrine is that prior depositions are more reliable than affidavits."[157]

---

[153] Doc. 33, Ex. B (Brown Aff.) ¶ 35.

[154] *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 252 (3d Cir. 2007) (citing FED. R. CIV. P. 56).

[155] *Id*. at 253.

[156] *Id*.

[157] *Id*. at 253-54; *see Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995) ("We have been highly critical of efforts to patch up a party's deposition with his own subsequent

Here, Brown's deposition took place on March 2, 2022.[158] During that deposition, he stated that while he had told Kharchevka that he felt he had been targeted, he did not tell her that such perceived unfair treatment had been due to his age or race.[159] Indeed, Petco's attorney conducting the deposition asked Brown point blank whether he had mentioned his age or race in his verbal complaints to Kharchevka.[160] Brown answered in the negative.[161] Then, five months later, on August 19, 2022, Brown's explanation changed in the affidavit he submitted with his opposition brief. There, Brown stated that he had complained of racial and age discrimination during these conversations with Kharchevka.[162] This discrepancy is not minor, as the definition of "protected activity" requires that Brown's complaints specifically mentioned age and/or race.

This contradiction alone does not automatically render Brown's affidavit a sham; indeed, "an affiant has the opportunity to offer a satisfactory explanation for the conflict between a subsequent affidavit and a prior deposition[.]"[163] But Brown has provided no such explanation here, and therefore the Court disregards his affidavit. Consequently, because Brown's verbal complaints to Kharchevka did not

---

affidavit. Almost all affidavits submitted in litigation are drafted by the lawyers rather than by the affiants and a comparison of the diction of [the] deposition with that of the affidavit makes clear that his affidavit is no exception.").

[158] Doc. 27, Ex. A (Brown Dep. Tr.).

[159] *Id*. at 169:11-170:17, 171:24-172:5.

[160] *Id*.

[161] *Id*.

[162] Doc. 33, Ex. B (Brown Aff.) ¶ 35.

[163] *Jiminez*, 503 F.3d at 254 (internal citations and quotations omitted).

include allegations that he had been targeted due to his race or age, they do not rise to the level of "protected activity" under the law and fail to satisfy a necessary element of his retaliation claims.

### 3.     E-Mails to Kharchevka

The next body of evidence is more straightforward for analysis purposes. Brown states that he engaged in protected activity by stating his opposition to racial and age-based discrimination in a series of e-mails to Kharchevka.[164] Upon review of those e-mails,[165] it is clear that Brown did not actually inform Kharchevka that he believed the perceived unfair treatment he was receiving was due to his race or age. As it is established in the Third Circuit that—while informal complaints may sometimes suffice—"the employee's opposition to unlawful discrimination must not be equivocal [or vague]."[166] Indeed, even if Brown had used the words "race" or "age," the Third Circuit has held that "oblique" references to discrimination, made in a vague fashion, make it "impossible to judge whether [a plaintiff] reasonably believed he was protesting a violation of Title VII."[167] Put differently, "[t]he mere mention of race"—or in this case, race or age—"does not transform a general list of grievances into opposition to unlawful activity under Title VII."[168] Therefore, Brown

---

[164]  Doc. 38 at pp. 24-27.

[165]  Doc. 27, Ex. T (Jan. 29, 2018 E-Mail Chain between Brown and Kharchevka) and Ex. U (Feb. 2, 2018 E-Mail from Brown to Kharchevka).

[166]  *Perry v. Harvey*, 332 F. App'x 728, 733 (3d Cir. 2009) (quoting *Moore v. City of Phila.*, 461 F.3d 331, 341-43 (3d Cir. 2006)).

[167]  *Id.*

[168]  *Id.*

cannot rely on these e-mails (that discuss neither race nor age) to establish a *prima facie* case of retaliation because they do not rise to the level or protected activity.

### 4.    Calls to the Petco Hotline

For the same reasons as stated above, Brown's attempted call to the hotline does not constitute a protected activity. An attempted phone call does not even give the Court a statement, or complaint, to analyze for "protected activity" purposes. Therefore, Brown may not rely on it to make his *prima facie* retaliation claims. Similarly, Brown may not rely on any of his colleagues' calls to the hotline because the elements for his claims require that he be the employee who engaged in the protected activity.

Accordingly, Brown has not established a *prima facie* case of racial or age-based discrimination because he has failed to establish that he engaged in a protected activity.  Because of this, further analysis of any burden-shifting is unnecessary, and Petco's motion is granted as to Counts V and VI.

## IV.    CONCLUSION

For the reasons stated, the Court GRANTS Petco's motion for summary judgment. An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge